UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
WALTON AVENUE ASSOCIATES, LLC,

                    Plaintiff,

-against-

KYLE BRAGG, as Trustee and the
Trustees of 32 BJ North Health          No. 19-CV-10245 (LAP)
Fund, 32J North Legal Services
Fund, Building Service 32BJ             MEMORANDUM & ORDER
Thomas Shortman Training,
Scholarship and Safety Fund, the
Building Service 32BJ
Supplemental Retirement and
Savings Fund (SRSP),

                    Defendant.
```

LORETTA A. PRESKA, Senior United States District Judge:

    Plaintiff Walton Avenue Associates, LLC ("Walton") filed an
action against several employee-benefit funds (collectively,
"the Funds"), seeking to vacate an arbitration award ("the
Award") totaling more than $173,000.  (Complaint, dated Nov. 4,
2019 [dkt. no. 1]; see also Notice of Cross-Motion ("Cross-
Motion"), dated Mar. 2, 2020 [dkt. no. 20].)  In response, the
Funds cross-petitioned to confirm the Award.  (Verified Answer
to Complaint and Defendants' Cross Petition to Confirm
Arbitration Award ("Cross-Petition"), dated Jan. 16, 2020 [dkt.
no. 12].)  For the reasons below, the Funds' cross-petition is
GRANTED, and Walton's petition is DENIED.

I.   **Background**

Walton owns three residential apartment buildings in the
Bronx:  1454 Walton Avenue; 1475 Walton Avenue; and 1478 Walton
Avenue.  (Exhibit A to Cross-Petition ("Anner Award"), dated
Aug. 8, 2019 [dkt. no. 12-1], at 1.)  To staff these buildings,
Walton employs three superintendents and two porters.  (Id.)
Each superintendent is assigned to a specific building, while
the porters split their time among the three buildings.  (Id.)
Collectively, the porters work full-time, but they do not work
more than sixteen hours per week in any one building.  (Id. at
13.)

The Service Employees International Union Local 32BJ ("SEIU
32BJ") represents Walton's employees for the purposes of
collective bargaining.  (Complaint ¶ 14.)  SEIU 32BJ negotiated
a collective-bargaining agreement with the Bronx Realty Advisory
Board ("BRAB"), a multi-member association representing several
employers.  (See Anner Award at 1.)  Employers can adopt that
contract (the "BRAB Agreement") on behalf of individual
buildings by filing an "assent."[1]  Walton filed three assents to
the BRAB Agreement, one for each of the Walton Avenue buildings.

---

[1] (See Exhibit C to Cross-Petition ("2015 CBA"), dated Jan.
16, 2020 [dkt no. 12-3], at 7.)  Relevant to this litigation are
two iterations of the BRAB Agreement covering the periods from
March 15, 2015 to March 14, 2019, (see id.), and March 15, 2011
to March 14, 2015, (see Exhibit B to Cross-Petition ("2011
CBA"), dated Jan. 16, 2020 [dkt. no. 12-2].)

(See Exhibit D to Cross-Petition, dated Jan. 16, 2020 [dkt. no. 12-4]; Exhibit 3 to Cross-Motion, dated Mar. 2, 2020 [dkt. no. 20-3].)

The BRAB Agreement requires Walton to make certain financial contributions to the Funds.  (See 2015 CBA art. XXVII; 2011 CBA art. XXVII.)  The Funds provide benefits to "eligible employees," including health insurance, pensions, and pre-paid legal services.  (2015 CBA art. XXVII; 2011 CBA art. XXVII.)  The BRAB Agreement covers full-time employees, but part-time employees--defined as those "who are regularly scheduled for 16 hours a week or less"--are not covered.  (2015 CBA art. XXXVIII, ¶ 2; 2011 CBA art. XXXVIII, ¶ 2.)  Walton contributed to the Funds on behalf of the superintendents but not the porters.  (Anner Award at 1-2.)

After learning of that fact following an audit, the Funds initiated arbitration proceedings against Walton before arbitrator John Anner.  (See Exhibit G to Cross-Petition, dated Aug. 27, 2019 [dkt. no. 12-7], ¶ 1.)  The Funds sought to recover, inter alia, unpaid and, in their view, BRAB-Agreement-required contributions for the porters.  (Anner Award at 2.)

Walton offered two theories for why the BRAB Agreement did not mandate contributions for the porters.  (See id. at 4-6.)  First, Walton averred that the porters' hours among the three buildings could not be considered together, because each

3

building's separate assent rendered each a unique entity for purposes of the BRAB Agreement.  (Id. at 4-5.)  Because the porters did not work more than sixteen hours per week in any one building, Walton maintained that it was not obligated to make any contributions on their behalf.  (Id.)  Second, Walton argued that a 2000 arbitration ruling by Roy Barnes (the "Barnes Award")[2] conclusively established that the porters were excluded from the Funds' coverage.  (Id. at 5-6.)

Arbitrator Anner disagreed on both fronts.  He determined that, for the purposes of the BRAB Agreement, the three buildings operated as a collective unit governed by a single "Staffing Agreement."  (Id. at 14-15.)  That conclusion, Anner found, was consistent with--and indeed supported by--the Barnes Award.  (Id. at 14-16.)  Given that, and because the porters effectively worked a full schedule among the three buildings, Anner held that the Funds were entitled to Article XXVII contributions for the porter positions.  (Id. at 15-16.)  Anner awarded the Funds $173,124.17 in requested contributions, liquidated damages, and accrued interest.  (See id. at 16;

---

[2] The Barnes Award determined that, so long as Walton complied with the Staffing Agreement entered into with SEIU 32BJ, it was not required to contribute to the Funds on behalf of the porters.  (See Exhibit 4 to Cross- Motion ("Barnes Award"), dated July 25, 2000 [dkt. no. 20-4], at 1-2.)  To reach that conclusion, Barnes had to amend his initial award after Walton "notified" him of the existence of the Staffing Agreement with SEIU 32BJ.  (See id.)  More on that later.

Cross-Petition ¶ 63.)  Walton has never contested that specific amount; it protests only that it should not pay at all.

Walton thereafter filed a petition to vacate the Award, and the Funds cross-petitioned to confirm it.  Walton's positions in this litigation generally track its arguments in the arbitration proceedings.  (See Walton's Memorandum of Law in Support of Motion to Vacate an Arbitration Award & Opposition to Defendants' Motion to Confirm ("Walton Br."), dated Mar. 2, 2020 [dkt. no. 21].)

## II.  Legal Standard

"The role of a district court in reviewing an arbitration award is narrowly limited," and an arbitrator's "determinations are generally accorded great deference under [federal law]." Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr., 729 F.3d 99, 103 (2d Cir. 2013) (quotation marks omitted). The Federal Arbitration Act ("FAA") mandates that an arbitration award be confirmed absent an affirmative showing that a specific ground for vacating it exists.  See 9 U.S.C. § 9; Jock v. Sterling Jewelers Inc. ("Jock I"), 646 F.3d 113, 121 (2d Cir. 2011).

Section 10(a) of the FAA provides four grounds for vacatur, only one of which is relevant here:  A court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and

definite award upon the subject matter submitted was not made."
9 U.S.C. § 10(a)(4).  That provision is construed narrowly,
especially when "invoked to challenge an award deciding a
question which all concede to have been properly submitted in
the first instance."  Jock I, 646 F.3d at 122 (quotation marks
omitted).  The Section 10(a)(4) inquiry trains on "whether the
arbitrator had the power . . . to reach a certain issue, not
whether the arbitrator correctly decided that issue."  Jock v.
Sterling Jewelers Inc., 942 F.3d 617, 622 (2d Cir. 2019)
(cleaned up), cert. denied, No. 19-1382, 2020 WL 5882321 (U.S.
Oct. 5, 2020).

Alternatively, a "court may set aside an arbitration award
if it was rendered in manifest disregard of the law."  Weiss v.
Sallie Mae, Inc., 939 F.3d 105, 109 (2d Cir. 2019).  To vacate
for manifest disregard, the Court must identify "something
beyond and different from a mere error in the law or failure on
the part of the arbitrator[ ] to understand or apply the law."
Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 208 (2d
Cir. 2002).  "Rather, the award should be enforced, despite a
court's disagreement with it on the merits, if there is a barely
colorable justification for the outcome reached."  T.Co Metals,
LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir.
2010) (quotation marks omitted).  "It is only when an arbitrator
strays from interpretation and application of the agreement and

6

effectively dispenses his own brand of industrial justice that his decision may be unenforceable." <u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 671 (2010) (cleaned up).

**III. <u>Discussion</u>**

Walton raises two points in support of vacatur: (1) by ignoring the Barnes Award's binding holding, Anner both exceeded his authority and manifestly disregarded the law; and (2) Anner manifestly disregarded the BRAB Agreement's plain language and instead imposed his own brand of "industrial justice." (<u>See</u> Walton Br. at 13–16; <u>see also</u> Walton's Reply Memorandum of Law in Support of Motion to Vacate an Arbitration Award ("Walton Reply"), dated Apr. 16, 2020 [dkt. no. 24], at 4–8.) Neither argument is persuasive.

**a. <u>The Barnes Award</u>**

Walton contends that "[t]he Barnes Award was final and binding upon the parties and, such, was an express limitation upon Arbitrator Anner's authority." (Walton Br. at 12.) Walton avers that, because collateral-estoppel principles apply to arbitration awards, the Barnes Award "establishes a clear burden of proof:  if the Funds wanted to relitigate the question of contributions on behalf of the porters, it was incumbent upon the Funds to show a change in circumstances." (<u>Id.</u> at 14.) And because the Funds did not do that, Walton reasons that Anner

exceeded his authority by reaching a conclusion contrary to the Barnes Award "without any change in facts." (Id.)

Walton cannot shoehorn that argument into Section 10(a)(4)'s framework. Collateral estoppel goes to the merits of this dispute, not to Anner's authority.[3] Walton points to nothing in the BRAB Agreement that limits Anner's power in the manner it suggests, and, in fact, Anner appears to have answered precisely the question presented to him. Instead, as it recognizes in its Reply, Walton is really contending that Anner manifestly disregarded the law. (See Walton Reply at 4-8.)

Prevailing on that argument is no easy task. "[A] simple error in law or a failure by the arbitrator[ ] to understand or apply it" is not enough. STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 78 (2d Cir. 2011). To satisfy the manifest disregard standard, Walton must establish that (1) "the law that was allegedly ignored was clear," (2) "the law was in fact improperly applied," and (3) the arbitrator knew the law and its application but intentionally disregarded it. T.Co Metals, 592 F.3d at 339.

---

[3] See Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 754 F.3d 109, 114 (2d Cir. 2014) ("[A]rbitrators possess authority to apply collateral estoppel based on prior judicial or administrative decisions."); U.S. Fire Ins. Co. v. Nat'l Gypsum Co., 101 F.3d 813, 817 (2d Cir. 1996) ("[A] defense based on the issue-preclusive effect of [a] prior judgment is part of the dispute on the merits.").

"An arbitration decision may effect collateral estoppel in a later litigation or arbitration . . . ." Bear, Stearns & Co. v. 1109580 Ont., Inc., 409 F.3d 87, 91 (2d Cir. 2005). Collateral estoppel can apply where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the parties had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Wyly v. Weiss, 697 F.3d 131, 141 (2d Cir. 2012) (brackets omitted). "The party asserting collateral estoppel bears the burden of demonstrating that it is entitled to this relief." Bear, 409 F.3d at 93.

Walton posits that each of those criteria is satisfied and that, therefore, the Barnes Award should have conclusively established that Walton was not required to make employee-benefit contributions on behalf of the porters. (See Walton Br. at 13; Walton Reply at 5-6.) Critically, however, the question is not whether this Court, from first principles, believes that the Barnes Award should receive preclusive effect. Instead, the Court's examination must focus on whether there exists a "barely colorable justification for" Anner's refusal to apply collateral estoppel. Kolel, 729 F.3d at 103.

To make that determination, it is necessary to examine the Barnes Award's three paragraphs in detail. Barnes began by

acknowledging that he issued "an Award . . . on May 19, 2000
which obligated [Walton] to contribute to the Union Benefit
Funds on behalf of [the porters]." (Barnes Award at 1.) Barnes
only amended his initial award after Walton notified him "that
the Staffing Agreement with [SEIU 32BJ] only required one
employee for each of the three buildings." (Id.) Barnes
admitted that the Staffing Agreement "was not presented during
arbitration proceedings." (Id. (emphasis added).) Barnes then
simply stated the following:

> Accordingly, I hereby amend the award issued on May
> 19, 2000 and hold that so long as [Walton] complies
> with the Staffing Agreement entered into with [SEIU
> 32BJ], contributions to the Benefit Funds will not be
> required on more than one employee for each building,
> and will not be required on behalf of [the porters],
> who will not be eligible for benefits from the Union
> Benefit Funds until such time as the Staffing
> Agreement is modified.

(Id. at 1-2.) Barnes provided no further reasoning concerning
his decision to amend the award or any explanation regarding
what opportunity, if any, the Funds had to address the Staffing
Agreement before the judgment was amended. (See id.)

   Based on Barnes' written decision, Anner plausibly could
have concluded that the Funds did not have a full and fair
opportunity to litigate the amended Barnes Award. Here, the
record provides no evidence that any adversarial process existed
regarding Barnes's decision to amend his award. Indeed, nothing
suggests that the Funds were offered any opportunity to respond

before the judgment was amended.  When reviewing the Barnes Award, Anner went so far as to surmise that Barnes had never even seen the Staffing Agreement prior to amending his ruling. (See Anner Award at 15.)  Although Walton maintains that conclusion is factually incorrect based on its arbitration submissions, (see Walton Reply at 7), Anner's "factual findings . . . are not subject to judicial challenge." Westerbeke, 304 F.3d at 214.  As a result, the Court cannot say that the Anner misapplied clear law by not affording preclusive effect to the Barnes Award.

Moreover, even if Walton could somehow show that Anner misapplied clear law, that still would not be enough to vacate Anner's Award.  To be entitled to vacatur, Walton must show that Anner "intentionally defied the law." STMicroelectronics, 648 F.3d at 78 (emphasis added).  And on that front, the record is crystal clear:  Anner did not ignore the Barnes Award.  To the contrary, he took stock of its existence and explicitly recognized that he lacked the authority to overturn it.  Anner maintained, however, that he had the power to determine what the Barnes Award meant, and he purported to interpret and apply the Barnes award in reaching his decision.  (See Anner Award at 14-15.)  Walton obviously disagrees with Anner's conclusion.  But even crediting Walton's position, at worst Anner failed to apply the governing legal principle correctly.  The Court will not--

11

and indeed cannot--vacate the Award for manifest disregard on that basis.  See T.Co Metals, 592 F.3d at 339; STMicroelectronics, 648 F.3d at 78.

In sum, Walton's collateral-estoppel theory fails to clear the high hurdle that the manifest disregard standard demands. The Court will not vacate the Award based on those grounds.

### b. Interpretation of the BRAB Agreement

Next, Walton avers that Anner manifestly disregarded the BRAB Agreement by ignoring "clear contractual language." (Walton Br. at 14.)  Walton maintains that "Article II of the BRAB Agreement makes clear that **each building** independently agrees to be bound by the BRAB Agreement," an understanding that Walton suggests is backed by more than two decades of collective bargaining.  (Id. at 14-15.)  Walton also posits that "Anner fail[ed] to consider the well-established principle that an employer may not be compelled to engage in multi-unit bargaining."  (Id. at 15 (citing Oil, Chem. & Atomic Workers, Int'l Union, AFL-CIO v. NLRB, 486 F.2d 1266 (D.C. Cir. 1973)).)

Article II of the BRAB Agreement states only that "[a]ll members of the Association shall execute an Assent form for each building they intend to be bound to this Agreement."  (2015 CBA art. II, ¶ 2.)  That provision and Article XXVII--i.e., the provision relevant to employee-benefit contributions--could be read in the manner that Walton suggests.  (See Walton Br. 14-

12

15.)  But under the manifest disregard standard, "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits."  <u>Oxford Health Plans LLC v. Sutter</u>, 569 U.S. 564, 569 (2013) (quotation marks omitted).  In fact, "[w]ith respect to contract interpretation, th[at] standard essentially bars review of whether an arbitrator misconstrued a contract."[4]

With that in mind, the Court cannot say that vacatur is appropriate.  Article II only specifies that an employer must execute an assent for each building it intends to be bound by the BRAB Agreement.  (<u>See</u> 2015 CBA art. II, ¶ 2.)  But Article XXVII speaks in terms of the "employer," not in terms of the "building" bound by the employer's assent.  In fact, Article II's separate use of "building" and "members of the Association"--which refers to the participating employers[5]-- suggests that those concepts may not be coterminous.  Walton

---

[4] <u>T.Co Metals</u>, 592 F.3d at 339; <u>see also</u> <u>Westerbeke</u>, 304 F.3d at 214 (observing that an arbitrator's "contractual interpretation [is] not subject to judicial challenge, particularly on our limited review of whether the arbitrator manifestly disregarded the law").

[5] (<u>See</u>, <u>e.g.</u>, 2015 CBA at pg. 2 ("The Union covenants, agrees and undertakes for itself and its members at all times to maintain, provide and furnish all essential and emergency services, and the supervision thereof to safeguard and maintain the properties of the <u>Employers who are members of the Association</u>." (emphasis added)); <u>id.</u> art. I, ¶ 1 (referring to the "Employer-Members of the Association").)

points to nothing in the BRAB Agreement that states--
unequivocally no less--that, for the purposes of employee-
benefit contributions, each building constitutes the relevant
bargaining unit.

In the absence of such one-sided evidence, Walton's
contention amounts to nothing more than a disagreement with how
Anner construed the contract.  See Seed Holdings, Inc. v. Jiffy
Int'l AS, 5 F. Supp. 3d 565, 590 (S.D.N.Y. 2014).  Accordingly,
Anner's interpretation of the BRAB Agreement must stand.  See,
e.g., Oxford, 569 U.S. at 569.

## IV.  Conclusion

For the foregoing reasons, the Funds' petition to confirm
the Award [dkt. no. 12] is GRANTED, and Walton's motion to
vacate the Award [dkt. nos. 1, 20] is DENIED.  The Clerk of the
Court is directed to mark the matter closed and all pending
motions denied as moot.

**SO ORDERED.**

Dated:      November 18, 2020
            New York, New York

LORETTA A. PRESKA
Senior United States District Judge

14